IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| MISTY D. WILLIAMS, | CASE NO. 3:25-CV-00053-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Misty Williams challenges the Commissioner of Social Security's decision denying her applications for disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Jan. 13, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL HISTORY

Ms. Williams applied for DIB and SSI on August 22, 2022, alleging she became disabled beginning in August 2021. (Tr. 205, 212). After these claims were denied initially and on reconsideration, Ms. Williams requested a hearing before an ALJ. (Tr. 71-79, 82-99, 101-09, 136). On August 29, 2023, Ms. Williams (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 34-66). On December 15, 2023, the ALJ determined Ms. Williams was not disabled. (Tr. 14-33). On November 14, 2024, the Appeals Council denied Ms. Williams' request

1

for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Ms. Williams timely filed this action on January 13, 2025. (ECF #1).

FACTUAL BACKGROUND

I.      **Personal and Vocational Evidence**

Ms. Williams, a high school graduate, was 44 years old on her alleged onset date and 46 years old at the hearing. (Tr. 42, 71). She has worked as a home health aide, a house cleaner, and an inspector for a manufacturing company. (Tr. 233). She stopped working in October 2020 to attend school. (Tr. 232). In November 2022, Ms. Williams completed the coursework to become a phlebotomist. (Tr. 42). In February or March 2023, she was hired as a home health aide but stopped working when the school year ended. (Tr. 43). Ms. Williams has a 12-year-old son in 7th grade who has Down syndrome, is "not very verbal," and requires help with feeding and personal hygiene. (Tr. 43, 47, 240 ("[he] depends on me for everything but walk[ing]")).

II.     **Relevant Medical and Other Evidence**

On August 18, 2021, Ms. Williams was assaulted. (Tr. 454). At the emergency department the following morning, she reported a headache; pain in her neck, back, left elbow, and left ankle; and abrasions. (*Id.*). On examination, her left eye was swollen and she had tenderness in her bilateral scapulas, spine, left elbow, and left ankle. (Tr. 456-57). Imaging revealed abnormal findings at the right carotid artery "suspicious for a pseudoaneurysm" and compression fractures in the thoracic and lumbar spine. (Tr. 462-63). Relevant medical history includes degenerative joint

2

disease of the left acromioclavicular joint in the shoulder and positive anti-SSA antibody testing.[1]

(Tr. 511). The pseudoaneurysm did not require acute intervention but endovascular neurosurgeon

Nicholas Liaw, M.D., recommended 81 milligrams of aspirin daily for stroke prevention, testing to

determine whether an anticoagulant was warranted, and follow-up for additional imaging in three

months. (Tr. 495). Ms. Williams received a thoracic lumbar sacral orthosis (TLSO) back brace for

the compression fractures and was discharged from the hospital on August 22. (Tr. 492, 545).

On September 2, Ms. Williams met with her family physician, Hasan Shafiq, M.D., where

she complained of back pain and expressed concern for infection of an abrasion at her left elbow.

(Tr. 449). She wore her TLSO brace to the appointment. (Tr. 450). Dr. Shafiq noted an infection

of the elbow abrasion and resulting weakness during extension and flexion of the joint. (*Id.*). He

prescribed prescription-strength ibuprofen for her back pain and antibiotics to treat the infection.

(Tr. 451).

On September 24, Ms. Williams followed up with Dr. Liaw for review of her internal

carotid artery (ICA) pseudoaneurysm. (Tr. 445). Ms. Williams described feeling well since

discharge and denied focal changes. (*Id.*). Dr. Liaw recommended she continue taking aspirin daily

and ordered updated imaging of her neck. (Tr. 448).

On October 4, Ms. Williams met with Mohammad Al-Nsour, M.D., for follow-up

investigation and treatment of a low titer of anti-SSA antibody. (Tr. 443). Dr. Al-Nsour noted Ms.

Williams wore a back brace and described her back pain as "improving." (*Id.*). He ordered anti-

---

[1]     Positive testing suggests Sjögren's disease, a chronic, autoimmune disease that
causes inflammation affecting the tear ducts and salivary glands. *Sjögren's Disease*, American College
of Rheumatology, https://rheumatology.org/patients/sjogrens-disease (last accessed November 17,
2025.

SSA-antibody testing after she recovered. (Tr. 444). On December 27, Dr. Al-Nsour noted Ms. Williams' anti-SSA-antibody test returned positive and referred her to a rheumatologist. (Tr. 424).

In January 2022, Ms. Williams began physical therapy for low-back pain and frequent muscle spasms. (Tr. 414). She initially reported difficulty standing, sitting, bending forward, lifting, climbing stairs, and performing daily activities such as cooking and cleaning. (Tr. 414-15). She described severe difficulty with grocery shopping. (Tr. 415). After six sessions, Ms. Williams demonstrated good improvement in her lumbar range of motion; also, she reported minimal pain with lumbar extension and decreased tightness, stiffness, and muscle spasms. (Tr. 387). She endorsed continued difficulty walking, standing, and lifting which led to increased rest breaks during household tasks, especially carrying groceries. (Tr. 386).

On February 24, Ms. Williams slipped on ice and felt something pop in her right ankle. (Tr. 385). At the emergency department the next day, Ms. Williams could not bear weight on the ankle; physical examination revealed tenderness to palpation and mild swelling on the lateral malleolus. (Tr. 380, 383). She was still in her back brace but denied back pain. (Tr. 380). An x-ray showed an oblique fracture at the distal fibula extending into the lateral malleolus. (Tr. 383). The attending provider applied a splint, told Ms. Williams to stay off her foot, and directed her to follow up with the podiatrist in one week. (Tr. 384).

On February 28, Ms. Williams met with Dr. Shafiq and complained of numbness and some swelling in her right foot. (Tr. 376). Dr. Shafiq recommended propping her right leg up at night to reduce the swelling, ordered a five-day course of oral steroids, and reordered ibuprofen for breakthrough pain. (Tr. 377).

On April 1, Ms. Williams returned to Dr. Shafiq's office and complained of numbness and tingling in her hand for about a week. (Tr. 370). Ms. Williams' right leg was wrapped and she used crutches to walk. (Tr. 371). Physical examination showed positive Tinel's signs at the right wrist and elbow. (*Id.*). She was assessed with carpal tunnel syndrome and recommended to use a wrist splint, ice, and naproxen for symptom relief and to follow up in one month. (Tr. 372).

On April 6, Ms. Williams visited the podiatry clinic for treatment of her right ankle. (Tr. 366). Reviewing the right-ankle x-rays from February, the doctor noted an oblique fracture at the distal fibula, increased medial gutter space concerning for a deltoid ligament injury, and increased tibia fibula clear space concerning for a syndesmotic ligament injury.[2] (Tr. 368). Updated imaging taken on April 5 showed bony trabeculation across the distal fracture site indicative of routine healing. (*Id.*). The doctor transitioned Ms. Williams to a controlled ankle motion (CAM) walking boot, instructed her to bear weight on the ankle as tolerated, and suggested an MRI to rule out a syndesmotic injury if the pain in her right ankle continues. (Tr. 367).

Ms. Williams returned to the podiatry clinic on April 20 and reported feeling unstable in the CAM boot and using crutches. (Tr. 360). She also tried transitioning to normal shoe gear, causing significant discomfort. (*Id.*). Updated x-rays showed further trabeculation. (Tr. 362). On examination of the right foot, the dorsiflexion external rotation stress test was positive, and Ms. Williams had pain with palpation of the medial deltoid complex and increased pain with ankle eversion and inversion. (Tr. 361). The doctor ordered Ms. Williams to continue using the CAM

---

[2]      Syndesmosis is a joint where two bones are united to each other by fibrous connective tissue, or syndesmotic ligaments. *See Syndesmosis*, *Stedmans Medical Dictionary* 875930 (Nov. 2014).

boot and bear weight as tolerated. (Tr. 362). Because Ms. Williams continued to have pain, the doctor ordered an MRI to rule out syndesmotic and deltoid ligament injuries. (*Id.*).

On May 4, Ms. Williams returned to the podiatry clinic and reported compliance with using the CAM walking boot, but she still had significant pain. (Tr. 353).

On May 12, Ms. Williams met with Dr. Shafiq and complained of numbness and tingling in her left hand. (Tr. 348). Dr. Shafiq prescribed gabapentin. (Tr. 350).

On May 18, Ms. Williams returned to the podiatry clinic and reported compliance with using the CAM boot, but she was not wearing it that day. (Tr. 345). On examination, the external rotation stress test was again positive. (Tr. 347). Ms. Williams had pain to palpation of the syndesmotic ligament and lateral ankle, but no pain with eversion or inversion. (*Id.*). An MRI showed an intermediate-grade syndesmotic sprain of the anterior inferior tibiofibular ligament. (Tr. 347). The doctor instructed Ms. Williams to continue using the CAM walking boot and bear weight as tolerated, and referred her for physical therapy, stating that if physical therapy did not help, she would need surgery. (*Id.*).

On May 23, Ms. Williams met with neurologist Samer Kareem, M.D., where she complained of intermittent numbness in the ring and pinky fingers of her left hand. (Tr. 341). She denied experiencing back pain and the physical examination findings were normal. (Tr. 343-44). Updated imaging of her neck showed resolution of the pseudoaneurysm. (Tr. 344). Dr. Kareem ordered lab work and an EMG to investigate for peripheral neuropathy. (*Id.*).

Ms. Williams returned to the podiatry clinic on June 15 and reported improved but continued ankle pain, especially when walking. (Tr. 337). She endorsed wearing regular shoes as well as using the CAM boot. (*Id.*). A physical examination found a positive external rotation stress

6

test, pain with palpation to the syndesmotic ligament and lateral ankle, and significant pain with squeezing of the tibiofibular complex. (Tr. 339). The doctor ordered x-rays of her weight-bearing ankle, instructed her to use the CAM boot, and asked that she schedule an appointment with a surgeon to repair her syndesmosis. (Tr. 340).

On July 8, Ms. Williams underwent open repair and internal fixation of the syndesmosis of her ankle. (Tr. 332-34). At her first follow-up appointment ten days later, Ms. Williams reported compliance with post-operative instructions to ice and elevate her ankle and keep weight off of it. (Tr. 317). She was advised of the plan to transition in early August to weightbearing with a CAM boot. (Tr. 319).

On July 14, Ms. Williams met with rheumatologist Edward Goldberger, M.D., for evaluation of her joint pain. (Tr. 280). She endorsed widespread musculoskeletal pain, dry eyes, shoulder spasms, and occasional swelling in her fingers. (Tr. 281). On examination, Ms. Williams could make full fists and Dr. Goldberger noted good grip and pinch strength. (*Id.*). She had "reasonably full pain-free cervical and lumbar spine motion" without local tenderness. (*Id.*). Dr. Goldberger ordered lab work and instructed Ms. Williams to follow up in three months. (Tr. 280).

At her second follow-up visit at the podiatry clinic on July 25, Ms. Williams arrived on crutches and reported keeping weight off her ankle. (Tr. 312). The doctor instructed Ms. Williams to continue keep weight off her right ankle and wear the CAM boot when walking. (Tr. 315). That day, Ms. Williams also presented for EMG testing, but she reconsidered and postponed the test until her foot was healed. (Tr. 315).

On August 8, at her third follow-up visit to the podiatry clinic, Ms. Williams reported improvement. (Tr. 311). She had some tenderness and reduced range of motion in the right ankle.

(*Id.*). The doctor instructed Ms. Williams to put some weight on the ankle while wearing the CAM boot and return in two weeks. (*Id.*).

On August 22, Ms. Williams reported she began walking in the CAM boot the day before. (Tr. 304). She endorsed significant improvement from her presurgical condition, describing only some "twinges" of pain. (*Id.*). The doctor instructed Ms. Williams to continue putting full weight on the ankle while wearing the CAM boot and advised her of the plan to transition to an ankle brace and regular shoe gear at the next appointment. (Tr. 306).

On September 7, Ms. Williams returned to the podiatry clinic and reported putting full weight on the ankle with the CAM boot on and she complained of some numbness on her dorsal foot. (Tr. 1021). The doctor instructed her to transition to full weightbearing in regular shoes and an ankle brace. (Tr. 1023).

On October 17, Ms. Williams reported compliance with full weightbearing in regular shoes and an ankle brace, with some numbness on the bottom of her foot. (Tr. 1018). The doctor instructed her to continue using the brace and referred her to physical therapy. (Tr. 1020).

On November 1, Ms. Williams met with David Lewis, M.D., for evaluation of her lumbar pain. (Tr. 1000). After an unremarkable physical examination, Dr. Lewis suggested physical therapy. (*Id.*). The record does not indicate whether Ms. Williams followed up on the referral or attended any physical therapy sessions for her back pain after that.

Ms. Williams returned to the podiatry clinic on November 21 and reported weightbearing while wearing an ankle brace and noted overall improvement, with only mild pain and numbness in the foot. (Tr. 1013). She had not started physical therapy. (Tr. 1014). The doctor released her to full activity without restriction. (*Id*).

Ms. Williams followed up with Dr. Goldberger on February 2, 2023. (Tr. 1087). She reported intermittent joint and shoulder pain and stiffness, back spasms that cause difficulty with sitting or standing at length, and occasional mild swelling in her hands. (Tr. 1088). Dr. Goldberger suspected she may have mild Sjögren's syndrome and prescribed naproxen for her joint pain.[3] (Tr. 1087).

On August 24, Ms. Williams returned to Dr. Goldberger's office for re-evaluation. (Tr. 1134). She reported constant generalized body aches and pain, most severe in her shoulders, and described wearing her ankle brace occasionally. (*Id.*). On examination, she demonstrated "widespread soft tissue and bony prominence tender points in a fibromyalgia distribution, including the proximal forearms, paraspinals, anterior chest wall, greater trochanters, and proximal knee fat pads." (*Id.*). Dr. Goldberger ordered additional lab work and prescribed muscle relaxers. (Tr. 1135).

### III.    Disability Application and Administrative Hearing

In connection with her applications for benefits, Ms. Williams completed a Disability Report claiming Sjögren's syndrome and a back injury limit her ability to work. (Tr. 232). In an Adult Function Report dated September 9, 2022, Ms. Williams stated she has been injured since August 2021 when she fractured two vertebrae. (Tr. 240). In February 2022, she broke her ankle and wore a boot until September 7, 2022. (*Id.*). She has muscle spasms and feels achy and stiff, disrupting her sleep and affecting her abilities to squat, bend, stand, walk, sit, kneel, climb stairs,

---

[3]    Sjögren's syndrome is an auto-immune disorder where the immune system attacks the glands that make moisture in the eyes, mouth, and other parts of the body as well as potentially causing joint and muscle pain and numbness and tingling in the hands and feet. *See Sjögren's syndrome*, *MedlinePlus*, http://medlineplus.gov/sjogrenssyndrome.html (last accessed [REOPEN+1], 2025)

and use her hands. (Tr. 240, 242). Prescription-strength ibuprofen does not help. (Tr. 243). She can drive, shop in stores weekly, walk for 10-to-20 minutes before needing to rest for 5-to-10 minutes, and follow spoken and written instructions. (Tr. 241-42).

During the hearing, Ms. Williams' attorney argued the limitations imposed by her fractured ankle, headaches, and Sjögren's syndrome prevent her from working. (Tr. 40). Discussed more fully below, a claimant is disabled if she has a medically determinable impairment that meets the severity of an impairment in the Listings. One of the Listings Ms. Williams claims to meet is Listing 1.17, which requires her to show (A) a history of surgery on a major weight-bearing joint; (B) impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months; and (c) a documented need for a walker, bilateral canes, or bilateral crutches. *See* 20 C.F.R. Subpart P, Pt. 404, App'x 1, § 1.17. Ms. Williams' attorney emphasized an ambiguity in the medical record: a treatment note stating she was (i) full weight-bearing with ankle brace" but also (ii) "compliant with non-weight-bearing of the operative extremity assisted by crutches." (Tr. 41).

Ms. Williams testified she cannot work because she has lower back spasms, tightness and spasms in her shoulders, and aches, stiffness, and soreness in her ankle. (Tr. 43, 49, 51). Her conditions cause discomfort in her back and legs when she sits too long. (Tr. 57). She has temporary relief from using an ankle brace, elevating her legs, taking hot showers, and exercising. (Tr. 50-51, 57). Ibuprofen and naproxen are ineffective. (Tr. 50).

The VE classified Ms. Williams' past relevant work as a housekeeper. (Tr. 61). The VE testified a person of Ms. Williams' age, education, and experience could not perform her past relevant work but could perform light exertion jobs (including small parts assembler, inspector and

10

hand packager, and mail sorter) and sedentary jobs (including document preparer, sack repairer, and touch-up screener) if subject to the ALJ's stated restrictions. (Tr. 61-63). The VE also testified that if the person needed two crutches for standing and walking, then the pool of available sedentary jobs is reduced to 10,000 and the person could not perform any light exertion jobs. (Tr. 64). No competitive work is available for a person who requires sitting with legs elevated for half of the workday or who works at half the pace of their coworkers. (Tr. 64-65). Finally, the VE stated employers tolerate an employee being off task no more than 10% of the workday and absent once a month. (Tr. 63).

**IV.    Medical Opinions and Prior Administrative Medical Findings**

On November 1, 2022, state agency medical consultant Rohini Mendonca, M.D., reviewed Ms. Williams' records and determined she was not disabled. (Tr. 71-79, 82-89). Dr. Mendonca found that Ms. Williams can lift 20 pounds occasionally, 10 pounds frequently; stand, walk, and sit for about 6 hours each in an 8-hour workday; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes, and scaffolds; frequently handle and finger; and must avoid concentrated exposure to extreme cold. (Tr. 75-76, 85-87).

On March 6, 2023, state agency medical consultant Elizabeth Das, M.D., largely affirmed Dr. Mendonca's findings and provided additional explanations. (Tr. 91-99, 101-09). Dr. Das agreed with the lifting, standing, walking, and sitting limitations, noting Ms. Williams' reports of joint pain after right foot surgery and spinal compression fractures and mild Sjögren's syndrome. (Tr. 94, 104). Dr. Das determined Ms. Williams had additional postural limitations, opining she could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and never climb

11

ladders, ropes, or scaffolds. (Tr. 95, 105). Dr. Das also determined Ms. Williams should avoid all exposure to dangerous machinery and unprotected heights. (*Id.*).

On October 17, 2023, Dr. Shafiq completed a medical-source statement and offered an opinion about Ms. Williams' functional limitations. (Tr. 1140-43). He determined that the intermittent pain, numbness, and tingling in her back, legs, right ankle, and hands limit Ms. Williams to sitting for 1 hour at a time and 4 hours in an 8-hour workday and to standing for 15 minutes at a time and standing and walking for 4 hours in an 8-hour workday. (Tr. 1141). She needs to walk around for 10 minutes of every hour and requires 2 to 3 unscheduled 20-minute breaks throughout the workday due to pain, numbness, and muscle weakness. (*Id.*). Dr. Shafiq also determined Ms. Williams requires a cane for pain and weakness; is limited to occasionally lifting 10 pounds; and can perform each of the following activities for half of the workday: grasp, twist, and turn objects; perform fine-manipulation tasks; and reach in front and overhead. (*Id.*).

### STANDARD FOR DISABILITY

Eligibility for benefits requires the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows the five-step evaluation process found at 20 C.F.R. §§ 404.1520 and 416.920 to determine whether a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

12

3.       Does the severe impairment meet one of the listed impairments?

4.       What is claimant's residual functional capacity and can claimant perform past relevant work?

5.       Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. *Id.*; *see also* 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f).

## The ALJ's Decision

At Step One, the ALJ determined Ms. Williams had not engaged in substantial gainful activity since August 1, 2021, the alleged onset date. (Tr. 20). At Step Two, the ALJ identified the following severe impairments: status post compression fracture of T12 and closed compression fracture of L1; status post February 2022 right distal fracture and right ankle sprain with July 2022 right ankle open reduction internal fixation (ORIF) and syndesmotic fixation with talonavicular joint osteoarthritis; right carpal tunnel syndrome; Sjögren's syndrome; and fibromyalgia. (*Id.*). At Step Three, the ALJ determined Ms. Williams' impairments did not meet the criteria of or show medical equivalence to any listed impairment. (Tr. 21).

At Step Four, the ALJ determined Ms. Williams' RFC:

13

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except: The claimant can never climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, crouch, kneel, stoop, and crawl. She must have the ability to alternate between sitting and standing, at her option, every 45 minutes for 1 to 2 minutes so long as she is not off task or has to leave the vicinity of the workstation. With the bilateral upper extremities, she can frequently handle, finger, and feel. With the right lower extremity, she can occasionally push and/or pull or operate foot controls. She can have occasional concentrated exposure to extreme cold. She cannot work around unprotected heights or unprotected moving mechanical machinery. She cannot perform any occupational driving.

(Tr. 22). The ALJ found Ms. Williams could not perform her past relevant work. (Tr. 27). At Step Five, the ALJ determined Ms. Williams could perform other jobs that exist in significant numbers in the national economy and concluded she was not disabled from August 1, 2021 through the date of the decision. (Tr. 28).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). "Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the

14

substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

Ms. Williams contends the ALJ erred in finding that her conditions did not meet or medically equal the severity of a listed impairment and did not consider all impairments and associated limitations when forming the RFC, did not evaluate the consistency of Dr. Shafiq's medical opinion with other evidence, and did not properly assess her pain. (ECF #8 at PageID 1173). The Commissioner counters that Ms. Williams did not prove her conditions met or medically equaled a listed impairment and the ALJ properly evaluated Dr. Shafiq's medical opinion and statements Ms. Williams made about her symptoms. (ECF #10 at PageID 1197). I address each alleged error in turn.

**I. The ALJ properly evaluated Ms. Williams' medical impairments and substantial evidence supports her Step Three conclusion that the impairments, singly or in combination, do not meet or medically equal a listed impairment.**

At Step Three of the evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments and meets the duration requirement. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The Listing of Impairments, located at Appendix 1 to Subpart P of Part 404 of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a).

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." *Id.* §§ 404.1525(c)(3), 416.925(c)(3). A claimant meets the listing if she satisfies all the criteria of the listing. *Id.*; *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). A claimant is also disabled if her impairment is the medical equivalent of a listing. 20 C.F.R.

16

§§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F.App'x. 488 (6th Cir. 2010). An impairment is the medical equivalent of the listing if the impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). The claimant bears the burden of showing the severity of her impairments meets or medically equals a listed impairment. *Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001).

The ALJ must consider all evidence in making a finding that a claimant's impairments do not medically equal a listing. Social Security Ruling (SSR) 17-2p, 2017 WL 3928306, at *4 (Mar. 17, 2017). If the ALJ believes the evidence in the record does not reasonably support a finding that the claimant's impairments medically equal a listed impairment, the ALJ is not required to articulate specific evidence to support the ALJ's conclusion. *Id.* The ALJ's statement that the impairments do not medically equal a listed impairment is sufficient articulation for the finding, provided the ALJ's "articulation of the reason(s) why the claimant is or is not disabled at a later step" is sufficient for the Court to determine the basis for the finding about medical equivalence at Step Three. *Id.; see also Bledsoe v. Barnhart,* 165 F.App'x 408, 411 (6th Cir. 2006) (looking to findings elsewhere in the ALJ's decision to affirm a medical-equivalency determination at Step Three, and finding no need for the ALJ to "spell out every fact a second time").

Section 1.00 of the Listing of Impairments governs the assessment of listed musculoskeletal disorders. To meet the criteria for a musculoskeletal disorder, the claimant must present "objective medical evidence from an acceptable medical source to establish that [the claimant] ha[s] a medically determinable [impairment]," and "evidence from both medical and nonmedical sources, who can describe how [the claimant] function[s], to assess the severity and duration of [the claimant's impairment]." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(C)(1).

17

To meet Listing 1.17, a claimant must show she has (1) a history of reconstructive surgery or surgical arthrodesis of a major weightbearing joint; (2) an impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of 12 months; and (3) a documented need for a walker, bilateral canes or crutches, or a wheeled and seated mobility device entailing the use of both hands. *Id.* § 1.17. A claimant demonstrates a "documented need" for an assistive device when there is evidence from a medical source that describes the claimant's functioning and why the device is needed, and that she will require the device for a continuous period of 12 months. *Id.* § 1.00C6a. To medically equal Listing 1.17, the claimant must show her impairments are at least equal in severity and duration to the criteria of the listing. 20 C.F.R. §§ 404.1526(a), 416.926(a)

Here, the ALJ concluded Ms. Williams "does not have a severe impairment or combination of severe impairments that meets or equals the severity of one of the listed impairments." (Tr. 21). The ALJ then explained Ms. Williams "failed to meet the listing for 1.17" because she did not show she required bilateral crutches for a continuous 12-month period. (Tr. 22). The ALJ referred to Ms. Williams' hearing testimony that she used two crutches after the July 2022 surgery until she transitioned to a CAM boot a month or two later. (Tr. 22) (citing Tr. 53). Elsewhere in the decision, the ALJ noted Ms. Williams was advised to transition from full weightbearing in a CAM boot to full weightbearing in a regular shoe with an ankle brace in September 2022 and, in November 2022, Ms. Williams reported compliance with full weightbearing with an ankle brace. (Tr. 24) (citing Tr. 1013, 1023). Under these facts, Ms. Williams used crutches for about 3 months before she transitioned to regular shoe gear, 9 months short of the 12 months Listing 1.17 requires. According to Ms. Williams, she fractured her spine in two locations in August 2021 and

18

was "continually observed" on crutches from February 2022 to November 2022, a period of 10 months. (ECF #8 at PageID 1179). But even assuming she used crutches that whole time, she is still two months short.

She states, "[e]ven if she did not satisfy each and every element of Listing 1.17, the combination of her multiple severe impairments equaled the criteria of Listing 1.17 as she was using an assistive device throughout the requisite period of time." (*Id.* at PageID 1180). She concludes the ALJ erred when she "incorrectly failed to combine the two injuries as a continuous period requiring the use of an assistive device to stand and/or ambulate." (*Id.*). But this argument confuses Listing 1.17's requirement that the claimant's *impairment* last for 12 months with its requirement that the claimant *needs an assistive device* for 12 months. *See* 20 C.F.R. Part 404, Subpt. P, App'x 1, § 1.17. Even presuming Ms. Williams' two injuries are one period of limitation, she does not identify how she needed an assistive device for that same period. She makes no mention of a second assistive device in her argument. In August 2021, a neurosurgeon recommended she wear a TLSO brace while recovering from her spinal fractures. (Tr. 492). Assuming this is the second assistive device to which Ms. Williams refers, I conclude she has not shown error.

Ms. Williams has not pointed to, and I have not located, case law supporting her position that the duration of her use of an assistive device that does not require using both hands, such as a TLSO brace, can be tacked onto the subsequent duration of time she used crutches to meet the continuous 12-month durational requirement for use of an assistive device entailing the use of both hands under Listing 1.17. Nor has she shown that the TLSO brace prevented her from using her upper extremities. In fact, there is evidence to the contrary. (*See* Tr. 1001) ("She reported that she only removed her brace when lying still. She reported no neurologic symptoms, and she was

19

still able to move as she likes, although she did have pain throughout the day."). Moreover, Ms. Williams has not shown that her other medical impairments cause physical limitations preventing her from using her bilateral upper extremities, which is necessary to establish medical equivalence with the assistive device criterion. *See Heather v. Comm'r of Soc. Sec.*, No. 5:24-cv-375, 2024 WL 4849697, at *10 (N.D. Ohio Nov. 21, 2024).

Next, Ms. Williams argues the RFC is not supported by substantial evidence because the ALJ did not consider the effects of fibromyalgia in combination with her other impairments. (ECF #8 at PageID 1181). Specifically, Ms. Williams contends she "had the requisite tender points and the treating rheumatologist . . . found that her musculoskeletal symptoms were consistent with fibromyalgia," but the ALJ "failed to consider the effects of acknowledged fibromyalgia in combination with her medically established impairments." (*Id.* at PageID 1182).

I first note that Ms. Williams' brief conflates arguments involving distinct steps of the sequential evaluation process. Whether a claimant meets or medically equals a listed impairment is determined at Step Three while a claimant's RFC is assessed at Step Four.

In support, Ms. Williams cites SSR 12-2p, 2012 WL 3104869 (July 25, 2012) that outlines the SSA's guidance for evaluating fibromyalgia and states the ALJ should consider a claimant's widespread pain and the waxing and waning nature of the impairment. But Ms. Williams does not identify what symptoms the ALJ purportedly did not consider or indicate what physical limitations the ALJ failed to account for in the RFC. This strays close to arguing that the diagnosis of fibromyalgia entitles her to a finding of disability, a proposition the Sixth Circuit has rejected. *See Vance v. Comm'r of Soc. Sec.*, 260 F.App'x 801, 806 (6th Cir. 2008).

20

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from her impairment. 20 C.F.R. §§ 404.1545(a), 416.945(a). At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence in the record, including medical signs and laboratory findings, the effects of treatment, reports of daily activities, recorded observations, medical opinions, and the effects of symptoms (including pain) that are reasonably attributed to a medically determinable impairment. 20 C.F.R. §§ 404.1520(e), 416.920(e); SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). The ALJ's assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, at *7.

The ALJ summarized the medical records relevant to Ms. Williams' fibromyalgia:

In July 2022, the claimant had positive anti-SSA antibodies with full fist, grip, and pinch strengths. She had full motor strength in upper and lower extremities. She denied headaches and dizziness.

* * *

In February 2023, she had reported intermittent arthralgias and was unable to sit or stand for long periods of time due to spasms in her back and occasional hand swelling. She denied sensitivity of the hands and feet and denied color changes in the hands and feet in the cold and denied arm and leg tingling or numbness.

* * *

In June 2023, she reported her back pain comes and goes. She had normal range of motion noted with a noted unremarkable physical exam. In August 2023, the claimant reported she had generalized pain all over her body that was only mild when seated for an extended period of time. She was wearing an ankle brace, but she reported it bothers her only occasionally. It was noted she remains active caring for her special-needs son. She was noted to have Sjogren and Sicca syndrome and fibromyalgia. It was noted she had widespread soft tissue and bony prominence tender points in a fibromyalgia distribution including proximal forearms, paraspinals, anterior chest wall, greater trochanters, and proximal knee fat pads. She

was assessed with arthralgia of multiple joints and fibromyalgia. She was advised it was important to get regular aerobic exercise and improve her sleep patterns.

(Tr. 24-25).

The ALJ then explained:

The undersigned finds the medical evidence of record to be more probative than the claimant's testimony and allegations. The claimant's allegations have been included in the residual functional capacity to the extent they are consistent with the evidence as a whole. Specifically, the claimant's allegations that she could not work during the adjudicatory period are inconsistent with the records, in that throughout the adjudicated period she could get to appointments, care for her special needs son, grocery shop, drive, cook, do laundry, and manage her hygiene.

The claimant's complaints have not been completely dismissed, but rather, have been included in the residual functional capacity assessment to the extent they are consistent with the evidence as a whole.

(Tr. 26).

Here, the ALJ indeed considered Ms. Williams' reports of disabling pain stemming from fibromyalgia and contrasted those statements with her unremarkable examinations showing normal spinal range of motion and full strength in the upper and lower extremities, her reported daily activities, and the description of some of her pain as mild. Addressed more fully below, these are appropriate factors for an ALJ to consider when evaluating a claimant's symptoms.

More to the point, the ALJ provided restrictions intended to accommodate the physical limitations resulting from Ms. Williams' pain. The ALJ acknowledged Ms. Williams' reported difficulty with sitting, standing, and walking for an extended time and her reported need to alternate positions and stretch frequently and, as a result, determined she required an option to alternate positions every 45 minutes throughout the workday. (Tr. 23-26). The ALJ also limited Ms. Williams to frequently using her upper extremities to handle, finger, and feel, and to occasionally climbing ramps and stairs, crouching, kneeling, stooping, and crawling. (Tr. 26-27).

22

Because the ALJ adequately considered the physical limitations resulting from Ms. Williams' fibromyalgia along with her other established impairments, I conclude Ms. Williams has not identified an error here.

**II.      The ALJ evaluated the supportability and consistency of Dr. Shafiq's medical opinion and substantial evidence supports her determination that the opinion is inconsistent with other evidence in the record.**

Next, Ms. Williams asserts the ALJ erred in evaluating Dr. Shafiq's medical opinion, primarily because the medical records the ALJ identified as inconsistent with the rest of the evidence actually supported the opinion. (ECF #8 at PageID 1186). The Commissioner contends the ALJ reasonably concluded Dr. Shafiq's opinion was inconsistent with other evidence and substantial evidence supports that conclusion. (ECF #10 at PageID 1204-05).

As part of the RFC assessment, the ALJ must review all medical opinions and prior administrative findings and explain how persuasive she finds them. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. *Id.* §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions," the two most important factors. *See id.* §§ 404.1520c(b)(2), 416.920c(b)(2). Supportability is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation" and consistency is "the extent to which

the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5853, 2017 WL 168819 (Jan. 18, 2017).

The ALJ's explanation should "generally include[] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* at 5859. The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability and the discussion is supported by substantial evidence, the Court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

Here, the ALJ explained why Dr. Shafiq's medical opinion was "not overall persuasive":

Hasan Shafiq, M.D., in October 2023, provided a medical source statement that opined that the claimant could sit 60 minutes at one time; stand 15 minutes at one time; sit and stand/walk about four hours in an eight-hour workday; that they would need to walk every 60 minutes for 10 minutes and take 2 to 3 unscheduled breaks for 20 minutes due to muscle weakness and pain with numbness. The claimant must use a cane for walking due to pain and weakness; that the claimant can occasionally lift 10 pounds. That the claimant could use her hands, fingers, and arms for reaching in front and overhead 50% during an eight-hour work period; that the claimant would be off task 10% due to pain that would interfere with attention and concentration. That the claimant was capable of low stress work and moderate stress normal work. The undersigned finds that this is not overall persuasive. It is supported by that she had been seen by them for two years for degenerative joint disease and multiple fractures with a guarded prognosis with symptoms of pain, numbness, and tingling; she had tried physical therapy. It is inconsistent with the medical evidence of record at the Hearing level that the claimant reported that she was weight-bearing with just an ankle brace and with only mild pain at times but some numbness that was improving and was happy with her progress. She was noted to be able to continue her daily activities without restriction and that she remained active caring for her

24

special needs child and that she had normal range of motion. It is not consistent
with the medical record that she denied sensitivity of the hands and feet and denied
color changes in the hands and feet in the cold or when upset and denied arm or leg
tingling or numbness.

(Tr. 25) (cleaned up).

The ALJ's reasoning withstands scrutiny. First, she concluded the opinion was supported
by Dr. Shafiq's treatment records showing complaints of pain, numbness, and tingling. Then, the
ALJ found the opined limitations inconsistent with Ms. Williams' hearing testimony, her reports
of improvement and "mild pain," her provider's instruction to return to daily activities without
restriction, her own reported daily activities, and the objective medical evidence. Considering the
record before the Court, described above, the ALJ's explanation about the persuasiveness of Dr.
Shafiq's medical opinion meets the minimum level of articulation the regulations demand and is
both reasonable and supported by substantial evidence.

According to Ms. Williams, substantial evidence supports the opposite conclusion that the
record is consistent with Dr. Shafiq's opinion. (ECF #8 at PageID 1186). In support, she
emphasizes the existence of compression fractures and the ankle fracture; her use of crutches; her
complaints of low back pain, mild ankle pain and numbness in the foot, intermittent arthralgias,
and shoulder pain; her abnormal bloodwork; and Dr. Goldberger's assessment of sicca syndrome,
SSA antibodies, arthralgia of multiple joints, and fibromyalgia. (*Id.* at PageID 1186-87). Notably,
Ms. Williams does not argue the ALJ failed to consider this evidence, and it is apparent from the
ALJ's decision that she did. Instead, Ms. Williams contends the same evidence the ALJ considered
in evaluating Dr. Shafiq's medical opinion supports the opposite conclusion—that Dr. Shafiq's
opinion is persuasive. Ms. Williams' argument is an invitation to reweigh evidence to reach her
preferred conclusion, which this Court cannot do. It bears repeating that a district court reviewing

25

a disability appeal does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard*, 889 F.2d at 681. Moreover, even if substantial evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

      Ms. Williams has not established reversible error on this basis.

**III.**    **The ALJ evaluated Ms. Williams' symptoms in accordance with the regulations and substantial evidence supports the ALJ's decision to discount her complaints of disabling pain as inconsistent with other evidence in the record.**

      Last, Ms. Williams claims the ALJ erred in evaluating the intensity, persistence, and limiting effects of her pain. (ECF #8 at PageID 1189).

      In evaluating a claimant's subjective reports of symptoms, the regulations provide that an ALJ must first determine whether there is objective medical evidence in the record that shows the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged. 20 C.F.R. §§ 404.1529(a), 416.929(a). If so, the ALJ must then consider the claimant's statements about the intensity, persistence, and limiting effects of her symptoms along with the objective medical evidence. *Id*. §§ 404.1529(c)(2), 416.929(c)(2). The ALJ also uses the factors outlined in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) to evaluate the claimant's statements:

      1.     A claimant's daily activities;

      2.     The location, duration, frequency, and intensity of pain or other symptoms;

      3.     Factors that precipitate and aggravate the symptoms;

      4.     The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.     Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6.     Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7.     Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors but should provide enough assessment to assure a reviewing court that the ALJ considered all relevant evidence. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005). The ALJ then considers whether there are inconsistencies in the evidence and the extent to which there are any conflicts between the claimant's statements and the rest of the evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). "[The claimant's] symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

The ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Without compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-cv-98, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "[A] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ." *Zingale v. Kijakazi,* No. 1:20-cv-2197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022). This is because the ALJ does not have to accept a claimant's subjective complaints and may discount subjective testimony when the ALJ finds the complaints are inconsistent with objective medical

and other evidence. *Jones*, 336 F.3d at 475-76. In reviewing the ALJ's evaluation of a claimant's symptoms, the court is limited to evaluating whether the ALJ's explanations for discounting the claimant's testimony are reasonable and supported by substantial evidence. *Id.* at 476. "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Ms. Williams argues the ALJ wrongly concluded her symptoms were inconsistent with the medical and other evidence of record. (ECF #8 at PageID 1189). In support, she points to her consistent complaints of pain documented across the record, stating her complaints justify additional functional limitations because the pain interferes with her ability to sustain activity and maintain attention and concentration. (*Id.* at PageID 1189-90). Implicit to her argument is the suggestion that well-documented complaints of pain alone are sufficient to establish that her pain is disabling, an unsupported proposition given that SSR 16-3p explicitly guides the ALJ to discount testimony that is inconsistent with other evidence in the record. *See* SSR 16-3p at *8 ("if the individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce [] her capacities to perform work-related activities"). The record confirms Ms. Williams did complain of pain, but the ALJ reasonably concluded her pain was not severe enough to be disabling.

The ALJ first summarized Ms. Williams' testimony:

The claimant testified that she had a valid driver's license. She has a 12-year-old son in the seventh grade with special needs who requires assistance, and she helps him and takes him to school occasionally. She has a two-story house, and she stays upstairs most of the time. She can do some household tasks but not a lot at once. She last had physical therapy for her back at the end of 2022 or the beginning of 2023. She has back spasms in the lower part of her back, and she does some exercises here and

there. She has a plate and some screws in her ankle, and she has a brace. She has problems with the aching with stiffness and soreness. After surgery, she had crutches for a while until she weaned herself out of her cam boot and then weaned herself off the crutches. She did not really do physical therapy for her ankle because she had her son and could not attend physical therapy because school was out. She has no problems cooking or doing laundry, but she gets very worn-out grocery shopping and must take a long break before she puts the items away. She has Raynaud's so she has difficulty being out in the cold. She has trouble sitting for too long because she feels like she needs to stretch to relieve the ache in her legs and back. Raising her legs helps her. She just saw her arthritis specialist and was diagnosed with fibromyalgia.

(Tr. 23) (cleaned up).

The ALJ also reviewed the statements Ms. Williams made to her providers about the intensity, persistence, and limiting effects of her symptoms, including low-back pain from remaining in a seated or standing position too long; reports of significant improvement after recovery from ankle surgery with only occasional mild pain; her release from post-surgical weightbearing restrictions to full daily activities; her complaints of generalized widespread pain of unspecified severity and occasional hand swelling; notably unremarkable physical examinations showing full muscle strength, normal extremity movement, and a steady gait; and her remarks about remaining active by caring for her special-needs son. (*See* Tr. 24-25). In rejecting the functional limitations in Dr. Shafiq's report, the ALJ determined they were inconsistent with Ms. Williams' ability to walk with only an ankle brace, her reports of occasional mild pain, her daily activities, and physical examinations showing normal range of motion. (Tr. 25). The ALJ then explained that Ms. Williams' statements were inconsistent with the other evidence:

> The undersigned finds the medical evidence of record to be more probative than the claimant's testimony and allegations. The claimant's allegations have been included in the residual functional capacity to the extent that they are consistent with the evidence as a whole. Specifically, the claimant's allegations that she could not work during the adjudicatory period are inconsistent with the records, in that throughout the adjudicated period she could get to appointments, care for her

> special-needs son, grocery shop, drive, cook and do laundry, and manager her
> hygiene.
>
> The claimant's complaints have not been completely dismissed, but rather, have
> been included in the residual functional capacity assessment to the extent they are
> consistent with the evidence as a whole.

(Tr. 26).

In short, the ALJ considered the relevant evidence, assessed limitations she found

consistent with that evidence including exertional and postural limitations, including a sit-stand

alternative, to address widespread joint pain and residual pain from healed fractures, and

determined Ms. Williams' claim that her pain rose to the level of disability was inconsistent with

her daily activities. The explanation for the last finding is reasonable and supported by substantial

evidence. Ms. Williams' child is largely dependent on her care and assistance outside of regular

school hours. (*See* Tr. 43, 47, 240). She reported to her rheumatologist that caring for him keeps

her active. (Tr. 1134). She denied issues with self-care or doing household chores, such as cooking

or doing laundry. (Tr. 55). While Ms. Williams endorsed difficulty with grocery shopping,

particularly with lifting heavy items, the ALJ reasonably accommodated her alleged pain with

lifting, pushing, and pulling restrictions.

Ms. Williams contends "[t]he testimony and medical evidence established the limited

nature of [her] daily activities and the difficulties she had due to her symptoms. The combination

of her symptoms affected her ability to function," and the ALJ erred by relying solely on her ability

to care for her special-needs child to discount her subjective complaints. (ECF #8 at PageID 1190-

91). Ms. Williams' argument is not persuasive. The ALJ identified other daily activities that, in

conjunction with caring for her son, undermine Ms. Williams' complaints of disabling pain. The

ALJ also addressed other factors relevant to the decision, including the location, duration,

30

frequency, and intensity of Ms. Williams' symptoms and her course of treatment. In short, Ms. Williams has not identified an error in the ALJ's evaluation of her pain or shown the ALJ's conclusion to discount her complaints of disabling pain lacked substantial evidence.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: November 17, 2025

_____

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge. Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl*, **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.*, **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** *Overholt v. Green*, **No. 1:17-cv-186, 2018 WL 3018175, at \*2 (W.D. Ky. June 15, 2018) (quoting** *Howard*, **932 F.2d at 509). The failure to assert**

31

specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).